## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDDIE LESTER**, *et al.*, | : | **CIVIL ACTION NO. 3:01-CV-1182** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **GENE P. PERCUDANI, CHASE** | : | |
| **MANHATTAN MORTGAGE** | : | |
| **CORPORATION, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., CHAPEL CREEK** | : | |
| **MORTGAGE BANKER, INC.,** | : | |
| **DOMINICK P. STRANIERI, and** | : | |
| **WILLIAM SPANER,** | : | |
| | : | |
| **Defendants** | : | |

------------------------------------------------------------------------

| | | |
|---|---|---|
| **PABLO ACRE**, *et al.*, | : | **CIVIL ACTION NO. 1:04-CV-0832** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CHASE MANHATTAN MORTGAGE** | : | |
| **CORP., WILLIAM K. SPANER,** | : | |
| **DOMINICK P. STRANIERI, GENE** | : | |
| **PERCUDANI, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., HOMES BY** | : | |
| **VINTAGE, INC., Y-RENT, INC.,** | : | |
| **and CHAPEL CREEK MORTGAGE** | : | |
| **BANKER, INC.,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

The above-captioned actions[1] are brought pursuant to the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68 and the

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"),

73 Pa. Stat. Ann. §§ 201-01 to -9.3.  Plaintiffs allege that defendants engaged in a

fraudulent real estate scheme to sell homes in excess of market value in the Pocono

Mountains region of Monroe County, Pennsylvania.  Presently before the court is

the motion for reconsideration (Civil Action No. 3:01-CV-1182, Doc. 422; Civil Action

No. 1:04-CV-0832, Doc. 285) of the memorandum and order of court (Civil Action

No. 3:01-CV-1182, Doc. 420; Civil Action No. 1:04-CV-0832, Doc. 283)[2] dated March

21, 2008, which denied the partial motion for summary judgment (Doc. 360) of

defendants Chase Manhattan Mortgage Corporation ("Chase") and William Spaner

(collectively hereinafter "the Chase defendants").  The UTPCPL claims are not

subject to the pending motion.  For the reasons that follow, the motion will be

denied.

---

[1]These cases have been consolidated for purposes of this memorandum and order.  <u>See</u> Fed. R. Civ. P. 42(a).

[2]For ease of reference, citations to the record will refer exclusively to entries docketed in <u>Lester v. Percudani</u>, Civil Action No. 3:01-CV-1182.  All pertinent documents filed <u>Acre v. Chase Manhattan Mortgage Corp.</u>, Civil Action No. 1:04-CV-0832 are duplicates of those filed in <u>Lester</u>.

I.    **Summary of Facts**[3]

Plaintiffs contend that defendant real-estate developer Gene Percudani ("Percudani"), operating through various corporate personae,[4] orchestrated a scheme to overvalue residential real estate in the Pocono Mountains.  He allegedly solicited defendant appraiser Dominick Stranieri ("Stranieri") to value his properties above market value, and he financed many with assistance from the Chase defendants.  Chase then sold the mortgages on the secondary market, often to Fannie Mae and Freddie Mac.  Chase retained servicing contracts for the loans, thereby extracting financial gain from the loans while shifting simultaneously the direct risk of default to remote purchasers.  Plaintiffs contend that the scheme left them with overvalued property that they were ill-equipped to afford.

Many of Percudani's clients lacked the financial resources necessary for a down payment, and he and his erstwhile business partner, non-defendant Gerard Powell ("Powell"), developed savings regimens, known as the Gold Key programs with the assistance of the Chase defendants.  See infra Part III.A.1.  Prospective homebuyers made an initial deposit and periodic payments into their program

---

[3]A more extensive discussion of the facts of this case is presented in the memorandum and order dated March 21, 2008 (Doc. 420), familiarity with which is presumed.

[4]Percudani allegedly operated through defendants Chapel Creek Homes, Raintree Homes, Chapel Creed Mortgage Banker, Homes by Vintage, and Y-Rent. The precise function of each of these entities is discussed at length in the memorandum and order dated March 21, 2008.  (See Doc. 420 at 3-8.)  For purposes of the instant memorandum, the court will collectively refer to Percudani and the corporations associated with him as "Percudani."

accounts until they accumulated sufficient savings to cover a down payment.  (Doc.

387, Ex. K at 164.)  Buyers also received various financial incentives for their

participation in the Gold Key programs.  (Id.)  Most borrowers used their Gold Key

benefits to cover monthly rental payments.  (Doc. 387, Ex. P at 48-49.)  As a result,

Percudani paid many borrowers' monthly rent directly to their landlords.  (Doc.

387, Ex. J ¶ 1(b)).  Plaintiffs' expert witness explained that payment of rent as a

purchase incentive is prohibited in the real estate industry because it casts doubt

upon a buyer's ability to meet monthly mortgage obligations.  (Doc. 387, Ex. D at -9;

see also Doc. 388, Ex. XIV at 96-97.)  Failure to adhere to this practice can result in

a buyer incurring debt service that her or she cannot manage in light of income and

credit history.  (Doc. 387, Ex. D at 9, 12.)

　　　While Gold Key borrowers saved for a down payment, Chase's in-house and

contract underwriters processed many of their loan applications.  Defendant

William Spaner ("Spaner"), a branch manager for Chase, advised underwriters that

plaintiffs' files would differ from those of typical borrowers.  (Doc. 387, Ex. Q at 175.)

Ordinarily, Chase would have immediately rejected loan applicants with credit

scores similar to plaintiffs'; however, Spaner instructed Chase underwriters that

plaintiffs' evolving credit would qualify them for the mortgages by the time of

closing.  (Id.)  An underwriter supervised by Spaner candidly testified that Chase's

handling of plaintiffs' loan applications was uncommon and that under usual

circumstances Chase simply did not process applications of borrowers who failed to

meet threshold lending criteria.  (Id.)

4

Percudani retained Stranieri to perform appraisals for all but eight of plaintiffs' mortgages.  (Doc. 352-7 at tbl. 10; Doc. 364 ¶ 12; Doc. 376 ¶ 12; Doc. 387, Ex. C.)  Prior to April 1997, Stranieri had appeared on Chase's "appraiser review list."  (Doc. 388, Ex. XI at 103.)  This list is a compilation of appraisers who Chase has placed on probationary status for (1) incorrectly valuing properties by more than fifteen percent, (2) omitting material information in an appraisal, or (3) committing other serious infractions.  (Doc. 388, Ex. VIII.)  Placement on the review list is the most severe sanction that Chase imposes on appraisers.  (Doc. 388, Ex. XI at 111.)  Chase regulations impose a mandatory framework for removal from the review list and require that listed appraisers receive five consecutive satisfactory field reviews.  (Doc. 388, Ex. IV.)  A removal request must also be submitted to Chase's Appraiser Panel Management department, and concurrence must be obtained from the appropriate underwriting center manager and from the Quality Assurance department.  (Id.)

In April 1997, Chase removed Stranieri from its review list without adhering to established removal procedure.  (Doc. 352-7 at tbl. 10; Doc. 388, Ex. IV; Doc. 388, Ex. XI at 103-04.)  Mike Sears ("Sears"), the official who removed Stranieri from the review list, testified that he unilaterally did so because it was unclear why Stranieri had been placed on review status.  (Doc. 388, Ex. XI at 104.)  Nevertheless, he testified that it is "most unusual" for an appraiser to appear on the list without cause, and he could not recall any other instance in which an appraiser had

inadvertently appeared on review status.  (Id. at 106; Doc. 450, Ex. III at 279.)[5]  Prior

to removing Stranieri from the review list, Sears searched for Stranieri's

performance review file but was unable to locate it.  (Doc. 388, Ex. XI at 110-11.)  He

did not engage in any discussions with Appraiser Panel Management, the

appropriate underwriting center manager, or the Quality Assurance department

prior changing Stranieri's status.  (Doc. 388, Ex. IV; Doc. 388, Ex. XI at 105.)  After

reinstatement, Stranieri began conducting allegedly inflated appraisals for

Percudani.  (Doc. 387, Ex. D at 3; Doc. 388, Ex. XI at 246.)  His appraisals—as well as

the few received from other appraisers—regularly exceeded the prevailing market

value of similar, non-Percudani homes by between $10 and $80 per square foot.

(Doc. 352-7 at 9-11 & tbl. 10; see also Doc. 387, Ex. C.)  Plaintiffs allege that these

flawed appraisals perpetuated above-market prices for Percudani properties,

leaving them with homes that they could not afford.  (Doc. 352-7 at 12, tbl. 10; Doc.

388, Ex. D at 3.)

---

[5]Document 450 is a set of supplemental exhibits submitted by plaintiffs in opposition to the motion for reconsideration.  Both parties have submitted evidence that they did not provide during summary judgment proceedings acknowledging the technical impropriety of doing so at the reconsideration stage.  See (Doc. 431 at 14 n.6; Doc. 436 at 7 n.3); Doe v. Allentown Sch. Dist., No. 06-CV-1926, 2008 WL 4427136, at *1 (E.D. Pa. Sept. 26, 2008) ("A motion for reconsideration is improper when it is used . . . to present previously available evidence or new arguments.").  The supplemental evidentiary submissions, however, confirm that material factual disputes exist throughout this litigation and bolster the disposition reached in the court's summary judgment memorandum.  The court will therefore consider both parties' supplemental submissions for purposes of the instant motion.

On March 21, 2008, the court issued a memorandum and order (Doc. 420) denying the Chase defendants' partial motion for summary judgment, which challenged the plaintiffs' RICO claims solely on the ground that their conduct did not proximately cause plaintiffs' damages.  The Chase defendants then filed the instant motion for reconsideration contesting the factual support for plaintiffs' claims and reasserting many of the arguments advanced during summary judgment proceedings.  The parties have fully briefed these issues, which are now ripe for disposition.

## II.   <u>Standard of Review</u>

The purpose of a motion for reconsideration is to correct manifest errors of law or fact, or to present newly discovered evidence.  <u>See</u> FED. R. CIV. P. 54(b), 60(b); <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d 906, 909 (3d Cir. 1985).  Accordingly, the court may alter or amend an order or judgment if the party seeking reconsideration shows at least one of the following grounds:  (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.  <u>Max's Seafood Café by Lou-Ann, Inc. v. Quinteros</u>, 176 F.3d 669, 677 (3d Cir. 1999) (citing <u>North River Ins. Co. v. CIGNA Reinsurance Co.</u>, 52 F.3d 1194, 1218 (3d Cir. 1995)).  "A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant."  <u>Abu-Jamal v. Horn</u>, No. Civ. A. 99-5089, 2001 WL 1609761, at *9 (E.D. Pa. 2001) (citations and

internal quotation marks omitted).  Furthermore, a party may not utilize a motion for reconsideration to "'simply change[ ] theories and [try] again,' thus giving [the movant] 'a second bite at the apple.'" <u>Prusky v. Prudential Ins. Co. of Am.</u>, 44 F. App'x. 545, 548 n.1 (3d Cir. 2002) (quoting <u>Bhatnagar v. Surrendra Overseas Ltd.</u>, 52 F.3d 1220, 1231 (3d Cir.1995) (alterations in original)).

## III.   **Discussion**

The Chase defendants raise three broad evidentiary challenges that to plaintiffs' RICO claim.  First, they claim that the record evidence fails to demonstrate that the Chase defendants facilitated Percudani's scheme and therefore their conduct did not proximately cause harm to plaintiffs.  Second, they assert that the Chase defendants did not knowingly aid Percudani's racketeering activity, and, finally, they contend that their actions did not proximately cause inflationary pressure on market prices for Percudani properties.  The court will address each of these issues *seriatim*.

### A.   **The Chase Defendants' Facilitation of the Scheme to Defraud**

The Chase defendants argue that their conduct did not facilitate Percudani's scheme to defraud and therefore did not cause plaintiffs' alleged damages.  They contend that the summary judgment record lacks sufficient evidence from which a reasonable jury could conclude either that the Chase defendants knew of the Gold Key programs or that they approved many of plaintiffs' loans contrary to standard underwriting practices.  Hence, they assert that their actions did not proximately cause injury to the plaintiffs.

1.    **The Chase Defendants' Knowledge of the Gold Key Programs as a Cause of Plaintiffs' Alleged Harm**

The Chase defendants first assert that the record contains insufficient evidence to conclude that they assisted in crafting the Gold Key programs or knew that borrowers received rental payments by enrolling in them.  The Chase defendants assert that Percudani implemented the Gold Key programs before Chase began financing his clients' mortgages and that therefore Chase was ignorant of Percudani's alleged racketeering activity.  The record, however, contains sufficient evidence from which a reasonable jury could reach contrary findings.

In early 1994, Powell consulted Gerald Tegethoff ("Tegethoff") for assistance creating the Gold Key programs.  Tegethoff, then a branch manager for American Residential Mortgage Services ("AmRes"), reviewed the Gold Key programs and provided advice for implementing them.[6]  Powell testified:

> Q.    Why were you introduced to Jerry Tegethoff?
> A.    Because . . . we wanted to make sure that [the Gold Key promotional program] was legal and that it was set up the right way and that the documentation was right, and that's why we spoke to him.
> Q.    Okay.  Was he the person you utilized to make sure the program was legitimate?

---

[6]The precise date of Powell's interaction with Tegethoff is unclear.  Maureen Perih, a manager for Percudani's mortgage company, stated that she introduced Powell to Tegethoff prior to April 1994.  (Doc. 436, Ex. A at 373.)  Tegethoff's employment with AmRes commenced in December 1993.  (Doc. 398, Ex. H at 22.)  Hence, Powell's consultation with Tegethoff must have occurred sometime in early 1994.

9

A.      I think there were attorneys that looked at it first, but then from, I guess, the mortgage standpoint, we wanted to make sure that it was okay. . . .

Q.      So would it be fair to say that Mr. Tegethoff was consulted concerning that this promotional giveaway program was legitimate?

A.      I believe that to be true.

(Doc. 387, Ex. M at 72-73.)  Powell further stated that Tegethoff aided in drafting

Percudani's standard purchase contracts used to implement the Gold Key

programs:

Q.      [Do you see the contract clause that reads] the purchase is stated in Article 2 of this agreement being and then there's a blank.

A.      Yes.

Q.      Is an adjusted sales price for underwriting purposes.  It is the original sales price of blank less the promotional give-away price of blank. . . . Who do you believe wrote that?[7]

* * *

A.      Jerry Tegethoff.

---

[7]The contractual clause described in this testimony reads as follows:  "The purchase price as stated in Article 2 of this Agreement being _____ is an adjusted sales price for underwriting purposes.  It is the original sales price of _____, less the promotional giveaway of _____."  (Doc. 436 at 6; see also, e.g., Doc. 386, Ex. 48 at 3; Doc. 386, Ex. 70 at 11; Doc. 386, Ex. 72 at 2.)

(Doc. 387, Ex. N at 129-30.)[8]   Powell further explained:

> Q.    Jerry Tegethoff provided you the sentence [described above]
>       . . . ; is that right?
>
> * * *
>
> A.    I believe that to be true.
>
> * * *
>
> Q.    But you don't remember when that was; is that right?
> A.    No.  I do know that it was before we started doing [the Gold Key
>       programs].
> Q.    So Jerry—
> A.    'Cause Gene [Percudani] wouldn't let me do this or us market
>       that if we didn't have confirmations from the lenders that it was
>       okay and from the attorneys that it was okay.
> Q.    So your testimony is that Jerry Tegethoff provided you with this
>       language before you started doing loans under the promotional
>       give-away program?
> A.    I believe that to be true.

(Id. at 133-34.)  Powell identified Tegethoff as an architect of the Gold Key programs

on numerous other occasions.  (See, e.g., Doc. 387, Ex. M at 93, Doc. 387, Ex. N at

---

[8]The report of plaintiffs' expert witness explained that inclusion of this
language in the agreements of sale directly produced underwriting deficiencies in
plaintiff's loans:

> This language is extraordinary, and dictates that the
> underwriter find out exactly what the promotional giveaway is.  This is
> especially important because the appraisal was almost always lower
> that [sic] the original sales price, showing that the latter was inflated.
> . . . Even the slightest inquiry would have informed the underwriter
> that the promotional giveaway was the seller's payment of the buyer's
> rent, as this information was widely disseminated through TV, radio
> and print advertisements.  *That information would have put an
> immediate end to these loans* . . . .

(Doc. 387, Ex. D at 7 (emphasis added)).

133-34, 172-73.)  Chase acquired AmRes in September 1994, succeeding to its debts,

liabilities, and obligations.[9]  (Doc. 398, Ex. J at 5.)

---

[9]Chase argues that it cannot be held liable for Tegethoff's actions performed during his tenure with AmRes, asserting:  "Plaintiffs state . . . that when Chase acquired AmRes it also acquired 'liability for Tegethoff's actions before the acquisition of AmRes[.]'  Plaintiffs cite no legal or factual support for this baseless conclusion, and the Court should disregard it.  Clearly, Tegethoff's purported conversations seven months before he came to work for Chase cannot establish Chase's knowledge of anything."  (Doc. 444 at 18-19 (alteration in original)).  Chase's argument, however, is confuted by its merger agreement with AmRes and the law governing corporate succession.  The merger agreement provides that "all debts, liabilities and duties of [AmRes] shall become the debts, liabilities and duties of [Chase]."  Am. Residential Holding Corp., Tender Offer Statement (Form SC 14D1), at Ex. 99.(c)(1) § 2.03 (Aug. 9, 1994) [hereinafter "Tender Offer Statement"], available at http://www.sec.gov/Archives/edgar/data/880837/0000950130-94-001177.txt.  The merger agreement is part of a series of filings with the Securities and Exchange Commission ("SEC"), some parts of which have been submitted by Chase in support of its partial motion for summary judgment.  (See Doc. 398, Ex. J.)  The court takes judicial notice of the merger agreement and subsequent filings associated with it for purposes of the instant motion.  See Fed. R. Evid. 201 (c), (f); Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (holding that a court may judicially notice documents filed with the SEC); Payne v. DeLuca, No. 2:02-CV-1927, 2006 WL 3590014, at *9 n.5 (W.D. Pa. Dec. 11, 2006) (judicially noticing SEC documents provided by parties).

Moreover, the Delaware General Corporation Law, which governed the merger between AmRes and Chase, provides that "all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it."  Del. Code Ann. tit. 8, § 259(a); see also Tender Offer Statement, Ex. 99.(c)(1) § 2.03 (applying § 259 of the General Corporation Law to the AmRes–Chase merger).  Hence, Tegethoff's knowledge of the Gold Key programs is imputed to AmRes, see In re Color Tile, Inc., 475 F.3d 508, 513 (3d Cir. 2007) ("Where an agent receives notice, that notice is imputed to the principal."), and Chase succeed to any liability arising therefrom upon completion of the merger, see Law Debenture Trust Co. v. Petrohawk Energy Corp., No. Civ. A. 2422, 2007 WL 2248150, at *9 n.27 (Del. Ch. Aug. 1, 2007) (citing Del. Code Ann. tit. 8, § 259).

Powell is not alone in his recollection of Chase's involvement in the Gold Key

programs.  Debbie Trabalka, an employee of Percudani responsible for overseeing

the loan-approval process, testified that she informed Chase's in-house

underwriters that the Gold Key programs paid rent on behalf of borrowers:

> Q.    Do you know whether [the payment of a borrower's rent] was
>        allowed under Chase's underwriting guidelines?
> A.    Yes.
> Q.    Do you know it was allowed?
> A.    Yes, because an underwriter had questioned what was the
>        giveaway, and I explained it was the rent, and she didn't tell me
>        I couldn't do it.
>
> * * *
>
> Q.    Do you mean an underwriter at Chase or a contract
>        underwriter?
> A.    It was an underwriter at Chase.
> Q.    Who was the underwriter at Chase?
> A.    I don't remember the name.  We dealt with several.
>
> * * *
>
> Q.    Was that the only time that you spoke with a Chase underwriter
>        about the rent payment?
> A.    No.  I believe I spoke to more than one . . . .

(Doc. 387, Ex. P at 46-48.)  Trabalka further testified that she was "almost certain"

that she discussed the rent-payment scheme with Spaner.[10, 11]  (Id. at 52; see also id.

at 98.)

Maureen Perih ("Perih"), whom Percudani employed as a manager, likewise

recalled numerous conversations in which she informed Tegethoff about the

payment of borrowers' rent:

---

[10]The Chase defendants argue that Trabalka's testimony is inadmissible as "too vague and uncertain to raise a genuine issue of material fact sufficient to rebut summary judgment." (Doc. 431 at 17.) They contend that it would be "inadmissible at trial as it lacks an adequate foundation and does not meet the personal knowledge requirement under Federal Rule of Evidence 602." (Id. at 18.) Rule 602 requires that a witness testify only about issues about which the witness has personal knowledge. See FED. R. EVID. 602. Here, Trabalka testified based upon her personal recollection of conversations that she had with Spaner and other Chase underwriters. She related the content of those discussions as well as the context in which they occurred, and she recalled discussing the Gold Key programs on several occasions. This recollection is sufficient to establish the admissibility of her testimony for purposes of summary judgment. Of course, the parties remain free to contest Trabalka's testimony at trial based upon the evidentiary record developed during those proceedings.

[11]Trabalka detailed the rent-payment program to Spaner and in-house Chase underwriters when they questioned the source of Percudani borrowers' rent payments. (Doc. 387, Ex. P at 98-100.) Chase underwriters sometimes requested verification of rent payments from Percudani clients, and they discovered that some borrowers paid rent using two separate checks. (Id. at 98.) Trabalka explained that these dual checks were generated when Percudani paid borrowers' rent through the Gold Key programs. (Id. at 99.) The programs provided borrowers a maximum monthly rent benefit of $700. (Id.) The borrowers' landlords received checks for this amount directly from an independent title company retained by Percudani to administer the program. (Id.) Borrowers whose rent exceeded $700 paid the difference using a personal check, resulting in two cancelled checks for each month's rent. (Id.) Hence, the Chase defendants' conversations with Trabalka produced clear notice that Percudani covered rental payments for many borrowers.

14

> Q.   Do you recall specifically, Maureen, that you told Jerry
>       Tegethoff, in connection with [the Gold Key programs], the
>       builder pays the borrower's rent?
> A.   Yes.
>
>                     * * *
>
> Q.   Is it your testimony now that you told Jerry Tegethoff that all
>       the Gold Key program people had their rent paid?
> A.   My testimony would be that Jerry Tegethoff and I discussed the
>       rent payments, definitely. . . .

(Doc. 436, Ex. A at 390-92; see also id. at 375-77, 384.)[12]

The record contains abundant evidence from which a reasonable jury could

conclude that Tegethoff—and vicariously Chase—knew that Percudani offered rent

payment as an incentive to borrowers in deviation from standard industry lending

practice.[13]  The jury could conclude that Chase facilitated Percudani's alleged

---

[12]Perih also informed Andrew Gehm, Tegethoff's supervisor, about the rent-
payment programs.  (Doc. 450, Ex. II at 427.)

[13]The Chase defendants argue that the record contains insufficient evidence
from which a reasonable jury could conclude that Percudani "regularly supplied
documentation regarding the rent-payment incentives to Chase," (Doc. 420 at 6), as
the court concluded in its summary judgment order.  (See Doc. 431 at 13-14.)
However, considerable evidence exists to support this conclusion.  An
overwhelming number of plaintiffs' purchase agreements produced by Chase
during discovery contained the contract clause drafted by Tegethoff memorializing
the amount of the promotional giveaway that borrowers received.  (See, e.g., Doc.
365, at 2, 19, 37, 55, 74, 102, 131, 146, 176, 189, 204, 222, 240, 253, 267, 282, 300, 316,
334, 361, 393, 411, 437, 449, 487, 489, 504, 518, 536, 546, 560, 578, 595, 606, 521, 636,
671, 684, 702, 715, 733, 780, 816, 827, 844, 862, 881, 933, 994, 1012, 1030, 1047, 1062,
1080, 1097, 1114, 1131, 1164, 1182, 1200, 1214, 1226, 1244, 1270, 1298, 1330, 1343, 1358,
1412, 1468, 1485.)  Chase Vice President John Conolly stated that "[a]n experienced
underwriter should have questioned" this clause, (Doc. 388, Ex. V at 2), and
plaintiff's expert identified the clause as a "red flag" alerting Chase to Percudani's
mortgage fraud scheme, (Doc. 387, Ex. D at 2-3).  Hence, a reasonable jury could
conclude that Chase possessed ample notice of the rent-payment program.

mortgage scheme through these inappropriate lending practices.  The motion for reconsideration will be denied to the extent it asserts that the Chase defendants were ignorant of Percudani's improper payment of borrowers' rent.

**2.      The Chase Defendants' Preapproval of Plaintiffs' Loans as a Cause of Plaintiffs' Alleged Injury**

The Chase defendants assert that they did not facilitate Percudani's lending fraud scheme because they granted final approval for plaintiffs' loans based upon objective lending criteria that comported with industry lending practice.  Their conduct, therefore, could not have caused injury to plaintiffs.

Chase's argument proves futile because it neglects the process under which Percudani clients received preliminary loan approval, which was essential to the home purchasing process.  When a Percudani borrower applied for a mortgage, Chase's contract and in-house underwriters performed an initial review of the application and granted preliminary approval regardless of whether the borrower's credit would have warranted final approval of the loan.  (Doc. 387, Ex. Q at 175-76.) Percudani would not begin construction until the customer received this preliminary approval.  (Doc. 450, Ex. I at 169.)  Linda Davis, a contract underwriter for Chase, described this process as unusual because Chase employed different criteria for the preliminary approval than it used for the final approval:

> Q.      Did Chase have a separate set of underwriting guidelines that were applied to the Chapel Creek loans?
>
> A.      Well, they shouldn't, but when I was told by . . . Bill Spaner [] that . . . they would be files that I would not normally see, that the borrower's credit was not really good but by the end of the time the house was build, that the credit would be improved,

that the funds for the down payment were being paid monthly to the builder and that by the time the loan was closed, they would have all their funds.  So those were the two big things, that was the credit and the funds.

Q.   How is that not consistent with Chase's underwriting guidelines?

A.   Because *normally if a borrower doesn't have good credit to start with, you don't approve a loan.*

Q.   But you weren't approving the loans at the beginning, correct?

A.   I was approving the loans subject to the credit being corrected. . . . [a]nd to verification that the down payment was being made.

Q.   That preapproval subject to conditions is something that was not permitted by the Chase guidelines?

A.   They approve—they have a preapproval *but not normally for credit, to improve your credit.*

(Doc. 387, Ex. Q at 175-76 (emphases added)).[14]  Davis expounded:

Q.   How did the preapproval apply to [Percudani] loans?

A.   Basically, the home isn't built, they didn't have the funds, their credit was not great when the loan was originally reviewed.  So conditions were put on there for the corrected credit, the funds to close, and the appraisal because we didn't always have the appraisal up front.

Q.   By the time you then reviewed the file against and issued a final approval, had you made the judgment that the borrower had satisfied Chase credit guidelines?

A.   At final approval if they did.

\* \* \*

---

[14]Spaner likewise confirmed that underwriters typically approve a borrower's credit at the outside of the loan application process:

Q.   Would you have an appraisal, generally, with the [initial] underwriting file?

A.   Not in the initial underwriting file, you would not have it.

Q.   What is an initial underwriting file?

A.   *That's where you're just approving the borrower's credit* and employment and affordability.

(Doc. 388, Ex. IX at 66 (emphasis added)).

> Q.    So in the end the Chapel Creek loans that were approved were
>       approved in accordance with Chase guidelines, correct?
> A.    You could look at it that way. . . . Yes.  Although most
>       preapprovals, *the credit up front is good on normal preapproval.*

(Doc. 431, Ex. F at 178-80 (emphasis added)).

Chase's preapprovals directly advanced Percudani's mortgage fraud scheme because Percudani did not begin construction before a borrower received preapproval.  (Doc. 450, Ex. I at 169.)  Borrowers ordinarily do not receive approval—either preliminary or final—without possessing adequate credit during the initial mortgage application process.  (Doc. 387, Ex. Q at 176.)  Hence, Chase's preapproval acted as plaintiffs' gateway to the purchase process in the absence of which they could not have consummated their home sales.

An internal Chase audit of loans financed for Percudani borrowers confirms that underwriters engaged in lending practice fraught with error.  On August 2, 2001, Chase Vice President John Conolly ("Conolly") transmitted the findings of this audit to Chase's contract underwriting organization.  Conolly

identified numerous underwriting deficiencies,[15] including inadequate

documentation of earnest money and failure to identify the source of borrowers'

rental payments in the months preceding the loan application.[16]  (Doc. 388, Ex. V

at 1-2.)

Internal audits likewise identified deficiencies in loans underwritten by

Chase's in-house staff.  During summer 2001, William Runyan, a Chase

representative, identified a variety of defects in loans approved by Spaner for

---

[15]Conolly identified the following deficiencies in the contract underwriting
files:

- The documentation did not proper [sic] support a paper trail for payment of the earnest money deposits.
- Incomplete bank statements.
- Short verified funds to close.
- Rent verifications were not accompanied with copies of 12 months of cancelled checks as required when the landlord is an individual.
- Appraisals with all three comparables from in [sic] the same sub-division and with the same builder.
- Unacceptable credit histories.
- Miscalculation of income.

(Doc. 388, Ex. V at 1.)

[16]Conolly explained that lenders must verify that borrowers have satisfied
their rent obligations to ensure that they can meet monthly mortgage obligations:

Q.   How about "Rent verification that's not accompanied with copies of 12 months of"—

A.   That's right out of the Freddie and Fannie guide.  *You have to have evidence that these people are making their rent payments.*  It's a way of establishing their credit history.  Are they paying their rent on time, as well as other debt?

(Doc. 388, Ex. X at 82 (emphasis added)).

Percudani clients.[17]  Many files contain errors in documenting deposits, (see, e.g.,

Doc. 392, Exs. XXIX, XXXVII), indicate that borrowers received loans despite

insufficient earnest money, (see, e.g., Doc. 392, Exs. XX, XXII, XXV), and reflect

improper handling of the promotional giveaways conferred by the Gold Key

programs, (see, e.g., Doc. 392, Ex. XXII, XXIII, XXV, XXXVIII, XXXIX, XL).[18]  In

one of the files, Spaner neglected to explain why a borrower received loan approval

despite a credit report containing fifty-two occasions on which the borrower paid

bills thirty days past due, eight occasions on which the borrower paid them sixty

days past due, and two occasions on which debts were resolved with the assistance

of a collection agency.  (See Doc. 392, Ex. XXI.)  Other audits revealed additional

deficiencies associated with borrowers' credit reports, (see, e.g., Doc. 392, Exs.

XXIII, XXIV, XXVII, XXXIII, XXXVII, XXXVIII, XL), and still others discovered

appraisals that were performed using outdated data or by reference to properties

outside of the relevant geographic market, (see, e.g., Doc. 392, Ex. XXIX, XXXI.)

Plaintiff's expert report identifies additional underwriting ineptitude, including:

---

[17]Most of the audits supplied to the court do not involve loans made to
plaintiffs.  All of them, however, concern loans initiated by Percudani, approved by
Spaner, and financed by Chase.  They therefore represent the underwriting flaws
recurrent throughout the processing of the loan applications for Percudani
borrowers.  (Doc. 391 ¶ 14.)

[18]One of the audits further explains the deficiency associated with the Gold
Key programs:  "The sales contract shows the borrower was provided $4,200 as a
promotional 'give away'.  A majority of the sales by this builder include this.  *The
file does not contain documentation to show that the underwriter investigated to
ensure this was a valid program.*"  (Doc. 392, Ex. XXXIX (emphasis added)).

(1) failure to document the source of earnest money, (2) failure to investigate the

source of unexplained bank deposits, and (3) failure to question why borrowers

were not paying rent during the period preceding their loan applications.  (Doc. 387,

Ex. D at 7-8.)

Coupled with evidence of Chase's knowledge of the Gold Key programs, see

supra Part III.A.1, a reasonable jury could conclude that Chase facilitated

Percudani's mortgage fraud scheme by relaxing the lending process for Percudani

borrowers, thereby causing the inflated market prices alleged by plaintiffs.

Accordingly, Chase's motion for reconsideration on this issue will be denied.[19]

---

[19]Chase also argues that the record contains inadequate evidence supporting the conclusion that it improperly removed Stranieri from the review list.  The court addressed this issue in its summary judgment memorandum, (see Doc. 420 at 9-10, 27-28), and Chase has identified no additional or newly discovered evidence warranting reexamination of that holding.  Rather, Chase suggests that Stranieri appeared on the review list due to administrative error and asserts in conclusory fashion that this benign explanation for his removal is the *only* rational one.

The record evidence, however, supports multiple *reasonable* interpretations of Chase's action.  Ordinarily, appraisers may be removed from review list status only after consultation with multiple departments within Chase's organizational structure.  Input for removal must be sought from the departments of Appraiser Panel Management and Quality Assurance and from the appropriate underwriting center manager.  (Doc. 388, Ex. IV.)  Sears, the official who removed Stranieri, consulted with none of these entities despite Stranieri's inexplicable appearance on the list.  (Doc. 388, Ex. XI at 111.)  Sears further stated that, in his experience, no appraiser other than Stranieri had ever appeared on the appraiser review list without cause:

> Q.   Have you ever known a situation where there's been a mistake on the [appraiser review] database with an appraiser being on review list and there was no intention for Chase to put him on the review list?
>
> A.   Outside of Stranieri circumstances, which are not further identified, I don't know of any other circumstances.

**B.**     **The Chase Defendants' Knowing Participation in Furtherance of Percudani's Racketeering Activity**

The Chase defendants next assert that there is inadequate record evidence

from which a reasonable jury could conclude that they knowingly joined the alleged

RICO conspiracy with the intent to facilitate Percudani's racketeering activity.

(Doc. 431 at 25-26.)  The Chase defendants have waived this argument for summary

judgment purposes because it is beyond the scope of their dispositive motion

briefing.  See Sullenberger v. Jobe, No. Civ. A. 06-430, 2008 WL 2705216, at *1 (W.D.

---

(Doc. 450, Ex. III at 279.)  Further, Conolly explained that Stranieri's review list
status should have raised concerns for underwriters approving plaintiffs' loans:

> In light of the fact that the appraiser on the majority of these loans, Mr.
> Dominick P. Stranieri[,] was on the Chase "Watch List"[] for fifteen
> months, the underwriters should have carefully evaluated each aspect
> of the appraisals and required additional information as deemed
> appropriate.  This is in accordance with Chase's Credit Guidelines.

(Doc. 388, Ex. V at 2.)  Plaintiff's expert report further impugns the unilateral
deletion of Stranieri from the review list without consulting the departments
required to participate in the established removal process:

> Sears was required to obtain concurrence from the appropriate
> underwriting center manager and Quality Assurance before Stranieri's
> review status was changed but failed to do so. . . . In other words,
> Chase Mortgage had, as is industry practice, a mechanism in place to
> police deficient appraisers but abandoned its own mechanisms . . . .

(Doc. 387, Ex. D at 5.)  A jury could reasonably deduce from this evidence that
Chase inappropriately removed Stranieri from the review list and failed to monitor
his performance after doing so.  The considerable evidence recounting Chase's
knowledge of Percudani's mortgage enterprise coupled with its shoddy
underwriting practices buttresses this conclusion.  Therefore, Chase's argument
regarding Stranieri's removal from the review list does not warrant reconsideration
of the court's summary judgment order.

Pa. July 8, 2008) ("A motion for reconsideration may not be used to present a new

legal theory for the first time or to raise new arguments that could have been made

in support of the original motion."); <u>Bronson v. Lasky</u>, No. 3:05-CV-0514, 2008 WL

2329177, at *1 (M.D. Pa. June 3, 2008) (quoting <u>Hill v. Tammac Corp.</u>, No. Civ. A.

05-1148, 2006 WL 529044, at *2 (M.D. Pa. Mar. 3, 2006)) ("[R]econsideration motions

may not be used to raise new arguments or present evidence that could have been

raised prior to the entry of judgment.").  The Chase defendants' brief in support of

their motion for summary judgment makes clear that their summary judgment

motion did not challenge the sufficiency of the evidence regarding the state-of-mind

element of the alleged RICO offense:

> Chase's instant partial summary judgment motion is based on
> *the narrow issue* that Plaintiffs cannot prove one of the essential
> elements of their RICO conspiracy claim, <u>i.e.</u>, that their damages were
> proximately caused by the alleged acts of racketeering. . . . [O]nly a few
> documents are actually needed to establish Chase's right to summary
> judgment as to each Plaintiff on *the narrow issue of proximate
> causation.*

(Doc. 363 at 1 (emphases added)).[20]  The remainder of the Chase defendants' brief

extensively argues causation but contains no discussion of their alleged lack of

knowledge about the Percudani defendant's racketeering enterprise.  (<u>See</u> <u>id.</u> at 16-

39; <u>see also</u> Doc. 400 at 4-30.)  The Chase defendants have not explained why the

court should reconsider their motion for summary judgment on an issue that they

---

[20]The Chase defendants' reply brief confirms the limited scope of their
motion for summary judgment:  "Chase's Motion is based *exclusively on the issue
proximate cause*, because proximate cause is a threshold standing issue for civil
RICO actions."  (Doc. 400 at 5 (citation omitted)).

did not raise (and that plaintiffs therefore did not gainsay) in the first instance.

Rather, Chase's argument on this ground represents precisely the type of

procedural maneuvering that is inappropriate in the reconsideration posture.  See

Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir. 1995) (stating that

parties may not utilize motions for reconsideration as opportunities to change

theories or receive "a second bite at the apple"); Anderson v. Corr. Med. Servs., No.

Civ. A. 04-3410, 2007 WL 1746258, at *2 (D.N.J. June 15, 2007) ("Generally, the

moving party is not entitled to raise new arguments that could have been addressed

in the original moving and responsive papers."). As such, the Chase defendants'

tardy argument regarding the intent with which they acted will be neither

considered nor reconsidered.[21]

---

[21]Notwithstanding the Chase defendants' untimely argument, plaintiffs have introduced ample evidence from which a reasonable jury could conclude that they knowingly conspired to further the Percudani defendant's racketeering enterprise. To establish liability for a RICO conspiracy, the plaintiff must prove that the defendant (1) knew of the racketeering activity perpetrated by a RICO enterprise and (2) agreed to facilitate the enterprise's actions.  See Smith v. Berg, 247 F.3d 532, 535 (3d Cir. 2001).  The alleged conspirator must join the scheme intending to further acts that, if completed, would satisfy all elements of a substantive RICO offense.  See id. at 537 n.9; Pflaumer Bros. v. Thordsen, No. Civ. A. 05-6709, 2007 WL 2317377, at *7 (E.D. Pa. Aug 8, 2007) (quoting Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990) ("RICO conspiracy requires agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.").  The conspirator need not actually commit the acts that form the substantive RICO offense.  See Smith, 247 F.3d at 537.  Rather, "one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1692(c) even if the defendant did not personally agree to do, or to conspire with respect to, any particular element."  id.; see also Salinas v. United States, 522 U.S. 52, 64 (1997). The relevant inquiry focuses upon whether the defendant joined the scheme knowing of the participants' intent to commit a RICO offense and agreed to "facilitat[e] a criminal pattern of racketeering activity."  Smith, 247 F.3d at 537 n.11.

## C.     The Chase Defendants' Actions as a Proximate Cause of Plaintiffs' Inflated Home Prices

The Chase defendants lastly assert that the record contains insufficient

evidence from which a reasonable jury could conclude that they conspired to

facilitate Percudani's exertion of upward pressure on home prices.  The Chase

defendants argue that such a conclusion "rests on the unstated premise that the

Plaintiffs are the market of homes sold by the Percudani Defendants" and that, in

---

In the instant matter, a reasonable jury could conclude that Chase agreed to further Percudani's scheme to sell homes in excess of market value.  Tegethoff assisted Percudani and Powell in creating the Gold Key programs, which fronted borrowers' rent.  See supra Part III.A.1 & nn.9, 11.  Throughout this process, the Chase defendants knew that industry practice prohibited such payments.  (See Doc. 388, Ex. XIV at 96-97.)  Lending guidelines issued by Fannie Mae and Freddie Mac also forbade this practice.  (Doc. 388, Ex. X at 82, 123; Doc. 392, Ex. XLIII at 20.)  During the lending process, Spaner informed underwriters such as Davis that Percudani borrowers would receive preliminary approval notwithstanding credit histories that would ordinarily have suspended the lending process.  (Doc. 387, Ex. Q at 175-76.)  Spaner then approved many mortgages despite loan applications containing significant deficiencies in credit history, funding documentation, and appraisals.  (See, e.g., Doc. 392, Exs. XVII-XLI.)  Chase, knowing of the rent-payment component of the Gold Key programs, approved plaintiffs' mortgage applications.  (Doc. 450, Ex. II at 427; Doc. 450 Exs. VI, VII.)  Following Stranieri's removal from the review list, he provided error-ridden appraisals upon which Chase's contract and in-house underwriters relied.  (Doc. 387, Ex. D at 2-3; Doc. 388, Ex. V at 2.)  Conolly later rebuked this practice, explaining that underwriters "should have carefully evaluated each aspect of the appraisals and required additional information."  (Doc. 388, Ex. V at 2.)  The Chase defendants sold many borrowers' loans to Fannie Mae and Freddie Mac while retaining lucrative contracts to service the star-crossed loans.  (Doc. 388, Ex. XIII at 157.)

Chase has offered innocuous explanations for each of these lending faults; however, a jury would not be manifestly unreasonable to reject Chase's explanations and adopt plaintiffs' position.  The record contains sufficient circumstantial evidence from which a reasonable juror could conclude that the Chase defendants knowingly facilitated Percudani's mortgage fraud enterprise.

light of the numerous market participants in the Monroe County area, no such

market control existed.  (Doc. 431 at 27.)

      The record, however, contains copious evidence supporting the denial of the

Chase defendant's motion for summary judgment on the ground that they

conspired to effect the above-market prices paid by plaintiffs.  Stranieri regularly

performed appraisals inflated by between $10 and $80 per square foot.  (Doc. 352-7

at tbl. 10.)  He valued new construction by referencing previously appraised

Percudani properties, thereby perpetuating inflationary market trends.[22]  (Id. at 14.)

Chase contract and in-house underwriters relied upon these appraisals despite

Chase credit standards to the contrary.  Indeed, these standards required

underwriters to review the appraisals and request additional information about the

proposed loans.  (Doc. 388, Ex. V at 2.)

---

[22]Plaintiffs' expert witnesses explained how builders and appraisers can exert inflationary pressure on prices for homes that they sell within a geographic market. (Doc. 352-7 at 12.)  Normally, an appraiser values properties by comparing them to similar ones that have recently sold in the same geographic area.  (Id.; Doc. 387, Ex. D at 3.)  If a review of neighboring home sites produces no readily analogized properties, the appraiser may select comparison properties from more distant geographic areas or from transactions conducted in the more remote past.  (Doc. 352-7 at 12.)  However, if the appraiser does so, he or she must adjust the price of selected comparison properties to reflect any differences in the value, region, and lapse of time between the prior transactions and the property being appraised.  (Id.) Uniform appraising standards also prohibit appraisers from comparing properties to others constructed by the same builder.  (Id.)

In the instant matter, Stranieri's flawed appraisals allowed the Percudani enterprise to exert upward pressure on market prices.  Stranieri often selected comparison properties in distant geographic markets featuring higher selling prices than those of the market where the appraised property was located.  (Id.; Doc. 387, Ex. D at 3.)  He did not adjust the comparison properties to reflect these market differences.  (Doc. 352-7 at 12.)  His appraisal documents fail to explain why he chose these properties or why he neglected to adapt extra-territorial prices to reflect localized conditions.  (Doc. 387, Ex. D at 3.)  He regularly referenced other Percudani properties as comparisons, protracting inflationary trends by using previously overvalued properties to substantiate new appraisals.  (Doc. 352-7 at 12.) He neglected to consider the Gold Key promotional giveaways and other favorable financing extended to plaintiffs, both of which directly affect purchase value.  (Id. at 3, 12; Doc. 387, Ex. D at 3.)  His estimated home values "appeared credible but were[,] in fact, misleading and unclear" as a result.  (Doc. 352-7 at 3.)  The plaintiffs' expert analyses reflect that "Stranieri continually over inflated the value conclusions in his appraisals," conferring upon Percudani the influence necessary to create a tumid market for his properties.  (Id.)  Hence, a jury could reasonably determine that Stranieri appraisals and Chase's concomitant financing operation proximately caused the inflated market prices for Percudani's properties.

Chase also possessed independent confirmation of Stranieri's overvaluation on at least one discrete occasion.  In early 1999, Chase solicited two of plaintiffs herein to refinance their mortgage, which Chase had previously approved using a Stranieri appraisal.  (Doc. 387, Ex. D at 5.)  Chase required an independent appraisal to complete the refinance.[23]  (Id.)  The appraiser concluded that Stranieri had severely overvalued the home and that contractors in Monroe County "had created their own market that did not fit with the current market conditions within [the] area."  (Id. at 5-6.)  Chase did not investigate the appraiser's conclusions or request additional information substantiating his claims.  (Id. at 6.)

---

[23]The plaintiff's expert witness has documented this appraisal in his report. The Chase defendants object to the expert report on the basis that plaintiffs' expert is not qualified to interpret appraisals, the report is hearsay, and the appraisal itself has not been made part of the record.  These objections are meritless.  Plaintiffs' expert witness possesses extensive experience in lending, underwriting, and drafting loan approval criteria.  (See, e.g., Doc. 387, Ex. D tab 5 at 1-5.)  Appraisal review falls within the ambit of his expertise in the area of loan review and approval.  Further, the statements are not hearsay because plaintiffs offer them to establish that Chase possessed notice of Stranieri's substandard appraisal practices. 30B MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 7005, at 64, 82 (4th interim ed. 2006) ("Other illustrations of a statement being offered for the purpose of showing the probable state of mind of the listener include being placed on notice or having knowledge."); see also Gov't Guarantee Fund of Fin., 960 F. Supp. 931, 938 n.6 (D.V.I. 1997) Finally, the underlying appraisal need not be introduced because an expert witness may testify regarding sources outside the record upon which he relied provided that they are "of a type reasonably relied upon by experts in the particular field in forming opinions."  FED. R. EVID. 703.  Underwriters and mortgage bankers such as plaintiff's expert undoubtedly review and rely upon the results of appraisals in assessing the qualifications of prospective borrowers.  This is sufficient to establish the admissibility of the evidence for purposes of summary judgment.  The parties remain free to raise evidentiary challenges to its admissibility through motions in limine or at trial.

A February 2002 letter from Freddie Mac to Chase's vice president of investor relations corroborates the facial defects in the appraisals of Percudani properties that resulted in above-market mortgage lines:

> [T]he appraisals contain inaccurate and incomplete data about the Mortgaged Premises, their neighborhood and comparable sales. They fail to adequately report and consider apparent factors that have an adverse effect on the value and marketability of the Mortgaged Premises. Likewise, they contain conclusions on value and marketability that are not supported by available market data.
>
> * * *
>
> Freddie Mac also has grave concerns about the "Why Rent"[24] program under which the subject loans were originated. *The overvaluation of the properties and the lack of disclosure in the loan files regarding the financial arrangements between [Percudani] and the borrowers, among other issues, implicate the legitimacy of the borrowers' down payment and the program in general.*

(Doc. 384, Ex. B at 1 (emphasis added)). This letter identified 115 deficient Percudani loans, over twenty-five of which were held by plaintiffs. (Id. at attach. A.) Despite facial defects in the loan files, Chase contract and in-house underwriters approved the loans for home prices above market value.

Finally, the record supports the conclusion that the Chase defendants proximately aided Percudani's alleged scheme to inflate home values. Tegethoff assisted Percudani and Powell in crafting the Gold Key programs, which enabled many plaintiffs to purchase homes they otherwise could not have afforded. See

---

[24]Why Rent, Inc. was responsible for Percudani's advertising campaigns. A significant portion of Why Rent's advertisements focused on the rent-payment incentive offered through the Gold Key programs. (Doc. 387, Ex. A; Doc. 387, Ex. K at 77.)

<u>supra</u> Part III.A.1.  Sears unilaterally removed Stranieri from review status

notwithstanding Chase's reinstatement requirements.  <u>See</u> <u>supra</u> Part III.A.2 n.19.

Thereafter, Chase's contract and in-house underwriters blindly adopted his

appraisals without performing a thorough review.  <u>See</u> <u>supra</u> Part III.A.2 n.19.

Hence, Chase impliedly endorsed Stranieri's appraisal methods that deviated from

standard industry practice.  (Doc. 352-7 at 12.)  Spaner, along with other Chase

officials, approved Percudani loans despite loan application packets rife with error.

<u>See</u> <u>supra</u> Part III.A.2 & n.18.  Chase then extracted immediate value from many of

the loans by selling them to Fannie Mae and Freddie Mac.  Were jurors to consider

the breath of the Chase defendants' involvement in Percudani's lending process,

they could reasonably conclude that the Chase defendants' conduct proximately

caused plaintiffs' allegedly inflated mortgage lines.  The motion for reconsideration

will be denied.[25]

---

[25]The Chase defendants contend that the court's analysis of proximate causation in its summary judgment memorandum runs afoul of <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258 (1991), and <u>Anza v. Deal Steel Supply Corp.</u>, 547 U.S. 451 (2006).  They contend that plaintiffs used non-Stranieri appraisals and received financing from entities other than Chase cannot advance a RICO conspiracy claim against Chase because Chase's actions did not directly cause them to purchase homes at inflated prices.

This contention is meritless.  <u>Holmes</u> requires a threefold analysis of proximate causation in a RICO case.  First, the plaintiff must prove that the plaintiff's damages directly resulted from the defendant's conduct.  <u>Holmes</u>, 503 U.S. at 269.  "[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages."  <u>Id.</u>  Second, a readily discernible method must exist for "apportioning damages among plaintiffs removed at different levels of injury from the [defendant's] violative acts, to obviate the risk of multiple recoveries."  <u>Id.</u>  Third, only directly injured plaintiffs, who "can generally be counted on to vindicate the law as private attorneys general" should be permitted to

maintain RICO actions.  Id. at 269-70.  In the instant matter, the court previously reviewed these factors and determined that plaintiffs have satisfied their summary judgment burden with respect to proximate causation.  (See Doc. 420 at 26-29.) Each plaintiff purchased a home directly from Percudani's RICO enterprise.  (Id. at 26-28.)  The Chase defendants aided this scheme via the Gold Key programs, by removing Stranieri from review status, by financing Percudani loans, and through a variety of other actions.  (Id.; see generally supra Part III.A.)  A straightforward method of assessing damages exists, as appraisals of plaintiffs' properties can easily be compared to the amounts they actually paid.  (Doc. 420 at 29.)  Finally, plaintiffs are the most appropriate parties to prosecute the alleged harms because they are personally liable for the inflated mortgages incurred as a result of the alleged enterprise. (Id.)

This conclusion aligns with Holmes, in which the Court held that *purchasers* who acquire goods and services directly from a RICO enterprise may advance a claim for injuries that occur through those transactions.  Holmes, 503 U.S. at 272-74. *Remote non-purchasers*, however, cannot establish the proximate cause necessary to a RICO claims.  Id.  Each of the instant plaintiffs *directly purchased* real property from the Percudani enterprise.  Hence, each of them have produced evidence that they suffered harm as a result of transactions with the Percudani RICO enterprise that Chase allegedly conspired to facilitate.

Anza reinforces this causation analysis.  In Anza, the Court concluded that a competitor of an individual who gains a market advantage through racketeering activity lacks standing to assert a RICO claim because the competitor's harm is remote from the racketeering activities.  Anza, 547 U.S. 457-58 (observing that plaintiff, which was a competitor of defendant, could not predicate a RICO claim based upon defendant's tax fraud because the government, rather than the plaintiff, was the direct victim of the fraudulent racketeering activity).  Individuals who engage in immediate interaction with the racketeering enterprise, in contrast, generally possess evidence of more direct harm.  They may therefore assert a RICO claim because they can demonstrate a proximate relationship "between the injury asserted and the injurious conduct alleged."  Bridge v. Phoenix Bond & Indem. Co., 128 S. Ct. 2131, 2142 (2008) (quoting Holmes, 503 U.S. at 268); V-Tech Servs. v. Street, 215 F. App'x 93, 96 (3d Cir. 2007) ("[P]roximate cause requires a direct relation between the injury claimed and the injurious conduct alleged.").

IV.   **Conclusion**

In their motion for reconsideration, the Chase defendants have provided

alternative interpretations for much of the evidence plaintiffs present in support of

their case.  However, the summary judgment posture requires the court to evaluate

all evidence and to draw all reasonable inferences in favor of plaintiffs, who have

proffered sufficient documentary and testimonial evidence to support the findings

reached herein and in the court's summary judgment order.  The Chase defendants

will have ample opportunity to present opposing evidence and to advocate for

alternate explanations at trial.  At this stage of the proceedings, however, the court

------------------------------------------------

Applying these principals, this court previously concluded:

In . . . <u>Anza</u>, the plaintiffs allegedly suffered harm as a result of the
aftershocks of transactions to which they were not parties.  They had
no direct dealings with the RICO enterprise.  Their damages were
attributable both to their own competitive inefficiency and the
secondary effects that their competitor's racketeering had on the
market for the plaintiffs' products.  Here, however, plaintiffs are direct
consumers, not remote competitors, of the defendants.  Their injuries
derive exclusively from personal contact with the Percudani
defendants' mortgage enterprise.  Unlike the plaintiffs in . . . <u>Anza</u>,
plaintiffs presently before the court did not engage in extraneous
actions from which their injuries may have resulted.  Thus, . . . <u>Anza</u>
do[es] not foreclose liability in the instant case.

(Doc. 420 at 28 n.19.)  The Chase defendants have identified no authority
challenging the validity of this conclusion.  <u>Anza</u> and <u>Holmes</u> do not require
reconsideration of the court's summary judgment order.

cannot usurp the role of the factfinder in light of the extensive evidence proffered

by plaintiffs.  The Chase defendants' motion for reconsideration will be denied.[26]


An appropriate order follows.


  S/ Christopher C. Conner  
CHRISTOPHER C. CONNER
United States District Judge

Dated:      October 24, 2008

---

[26]The Chase defendants correctly identify two citation deficiencies in the court's summary judgment memorandum (Doc. 420).  The first appears on page 5 in the third citation sentence.  The citation to Doc. 387, Ex. _L_ at 93 should appear as Doc. 387, Ex. _M_ at 93.  The second error appears in the final citation sentence of the paragraph that begins on page 5 and ends on page 6.  The citation to Doc. 387, Ex. M at 145 mistakenly identifies a page of Powell's deposition transcript that is not present in the record developed by the parties.  However, considerable record evidence supports the proposition to which the deficient citation applies, including Doc. 387, Ex. M at 73 and Doc. 387, Ex. N at 133-34, 158.  The court will issue a separate amending order memorializing these errata to clarify the factual support for its summary judgment disposition.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EDDIE LESTER**, *et al.*, | : | **CIVIL ACTION NO. 3:01-CV-1182** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **GENE P. PERCUDANI, CHASE** | : | |
| **MANHATTAN MORTGAGE** | : | |
| **CORPORATION, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., CHAPEL CREEK** | : | |
| **MORTGAGE BANKER, INC.,** | : | |
| **DOMINICK P. STRANIERI, and** | : | |
| **WILLIAM SPANER,** | : | |
| | : | |
| **Defendants** | : | |

-------------------------------------------------------------------------

| | | |
|---|---|---|
| **PABLO ACRE**, *et al.*, | : | **CIVIL ACTION NO. 1:04-CV-0832** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CHASE MANHATTAN MORTGAGE** | : | |
| **CORP., WILLIAM K. SPANER,** | : | |
| **DOMINICK P. STRANIERI, GENE** | : | |
| **PERCUDANI, CHAPEL CREEK** | : | |
| **HOMES, INC., RAINTREE** | : | |
| **HOMES, INC., HOMES BY** | : | |
| **VINTAGE, INC., Y-RENT, INC.,** | : | |
| **and CHAPEL CREEK MORTGAGE** | : | |
| **BANKER, INC.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 24th day of October, 2008, upon consideration of the motion

for reconsideration (Civil Action No. 3:01-CV-1182, Doc. 422; Civil Action No. 1:04-

CV-0832, Doc. 285) of the order of court (Civil Action No. 3:01-CV-1182, Doc. 420;

Civil Action No. 1:04-CV-0832, Doc. 283) dated March 21, 2008, and for the reasons

set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  The motion for reconsideration (Civil Action No. 3:01-CV-1182, Doc. 422; Civil Action No. 1:04-CV-0832, Doc. 285) is DENIED.

2.  A revised pretrial and trial schedule shall issue under separate order of court.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge